411 S.E.2d 692

**STATE of West Virginia, Appellee,**

v.

**Larry Eldon JAMES, Appellant.**

**No. 19938.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1991.

Decided Nov. 20, 1991.

Frances Hughes, Kanawha County Public Defender Corp., Charleston, for appellant.

Mario J. Palumbo, Atty. Gen., Janet E. James, Asst. Atty. Gen., Charleston, for appellee.

NEELY, Justice:

A jury convicted Larry Eldon James of kidnapping, first-degree sexual abuse, and first-degree sexual assault. Mr. Smith now appeals, alleging that the State failed to disclose exculpatory information and that the State used evidence that was the fruit

of a tainted photographic identification of Mr. James. We affirm.

## I.

On 24 May 1989, Pamela R.[1] was abducted by two men outside her home. The two men drove her to a secluded area and raped her. Afterwards, the two men discussed killing Ms. R., but one of the men convinced the other that they should take her home instead. After an investigation, the State charged Larry James and Joel Dustin with kidnapping, sexual abuse and sexual assault. Mr. Dustin arranged a plea bargain with the State under which he agreed to testify against Mr. James in exchange for no recommendation of sentence by the prosecutor in his case.

Mr. Dustin testified that he and Mr. James were the men who kidnapped and raped Ms. R. He further testified that he had convinced Mr. James not to kill Ms. R. and instead to take her home. Ms. R. corroborated this testimony. During the course of his examination in the appellant's trial, Mr. Dustin also testified about his record as a member of the United States Navy, but did not mention that he was AWOL[2] at the time of the kidnapping and rape. Mr. Dustin testified that the State did not promise him probation in exchange for his testimony.

Ms. R. testified about the details of her kidnapping and rape, and she identified Mr. James in court as one of her assailants. Previously Ms. R. had testified at a suppression hearing that she first picked Mr. James' picture from a group of six or seven shown to her by police detectives.

## II.

Mr. James claims that the State did not disclose exculpatory information as required under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982). Specifically, Mr. James claims that the State did not disclose to him an explicit agreement between the State and Mr. Dustin under which Mr. Dustin

---

**1.** In keeping with our practice in cases involving sensitive matters, we use initials rather than complete names.

**2.** Absent Without Leave.

would receive probation in exchange for his testimony. Mr. James also claims that the State should have informed him that Mr. Dustin was AWOL and that Mr. Dustin lied to the probation department about his military status.

■ The Fourteenth Amendment to the Constitution of the United States, as articulated in *Brady, supra,* and Article III, Section 14 of the Constitution of the State of West Virginia as articulated in *Hatfield, supra,* require the State to disclose all exculpatory information to the defendant upon request. We disagree, however, with Mr. James' contention that the State was required to provide appellant with any information that might have been useful to *impeach* Mr. Dustin. As the U.S. Supreme Court stated in *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976):

> It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. (Footnotes omitted.)

We stated in Syllabus Point 4 of *Hatfield, supra:*

> A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.

Although the evidence of Mr. Dustin's AWOL status and of his lies to the probation department could have been used to impeach Mr. Dustin's character, that evidence, in this case, does not tend to exculpate Mr. James given the identification by the victim. As the U.S. Supreme Court held in *United States v. Bagley,* 473 U.S. 667 at 676, 105 S.Ct. 3375 at 3380, 87 L.Ed.2d 481 (1985), impeachment evidence that might be used to show "bias or interest" also falls within the *Brady* rule, but being AWOL from the military or making false statements to probation officers does not demonstrate bias or interest.

■ Mr. James' other *Brady* claim is more problematic. The prosecution must disclose any and all inducements given to its witnesses in exchange for their testimony. Such deals are crucial as impeachment evidence; in some cases the jury may decide that the deal has created an incentive for the witness to lie. Mr. James claims that the State made such a deal with Mr. Dustin and did not disclose it to him. Lacking direct evidence, Mr. James cites the unusual circumstances under which Mr. Dustin obtained his probation. First, the judge in Mr. Dustin's case sentenced Mr. Dustin to 10 to 20 years. Approximately three weeks later, the judge, on his own motion, ordered Mr. Dustin to the Huttonsville Correction Center for "examination, diagnosis and classification." Then, after Mr. Dustin testified against Mr. James, the judge suspended Mr. Dustin's sentence.

■ Mr. James' counsel is correct that this course of conduct appears unusual and suggests the *possibility* of a deal between the State and Mr. Dustin. However, this Court will not overturn the ruling of a lower court on the basis of innuendo and possibilities. We suggest that Mr. James may want to file a petition for habeas corpus in order to develop the factual record for this claim. Clear evidence of a deal directly linking leniency for Mr. Dustin with testimony tending to convict Mr. James that was not disclosed would be grounds for a new trial.

### III.

Mr. James also claims that the trial judge should not have allowed Ms. R. to identify him in court. The trial judge held a suppression hearing and determined that Ms. R.'s identification of Mr. James was valid. At the suppression hearing, Ms. R. testified that she identified Mr. James from a group of six or seven photographs. Mr. James claims that before being shown this group of six or seven photographs, Ms. R. had been shown a single picture—one of Mr. James alone. Mr. James contends that this is the only reason Ms. R. was able to

identify him. Mr. James' claim is based on the following colloquy with Ms. R. at a preliminary hearing:

Q. Were you able to identify, through that photo lineup, one or both of the individuals?

A. Just the white man.

Q. And were you positive that was him?

A. Positive.

Q. And what made you positive?

A. Well, I remembered him from the photo. I remembered him.

▮ Ms. R. removed any confusion about her identification of Mr. James when she testified at trial. She testified that she got a good look at Mr. James during the ride in the car as well as during the prolonged assault. She provided an accurate description of Mr. James later that day and she positively identified him from the group of photographs four days later. Furthermore, Ms. R. denied at trial that she had ever been shown a single picture of Mr. James.[3]

We have previously held that:

A pretrial identification by photograph will be set aside if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

---

3. The following is a detailed excerpt from part of the trial.

Direct Examination

Q. Mrs. [R.], did detectives Westfall and Lanham hand you any photographs for you to look at?

A. Yes, they did.

Q. Do you recall how many they handed you?

A. I don't recall exactly how many. I would say six or seven.

Q. Anything that you remember specifically about the photographs as a group?

A. I remember the third one I saw I identified and they said, are you sure, and I said, yes. They asked me to continue looking and I did, but I said there isn't any reason to because this is he.

Q. And when you say you identified him and this is he, who are you referring to?

A. The defendant.

Q. In terms of the driver that you told us was a short, dark complected individual and the person in the back seat of the car with you that you've described, I believe, as six-two, muscular, blondish hair, which of those two gentlemen are you meaning when you said you picked him out of the photo?

A. Blondish, six-two, blondish hair.

Q. Was there any doubt in your mind when you saw those photographs that Number 3 was the assailant?

A. No doubt.

Q. When detectives Lanham and Westfall gave you the photographs to look at, did they make any suggestions to you which led you to believe that one or more of the assailants were, in fact, contained within those photographs?

A. No, they didn't.

Q. Mrs. [R.], I would like to ask you if you recognize one of the assailants today in the courtroom? Do you see any one of the assailants in the courtroom today?

A. Yes, I do.

Q. Will you tell Judge Casey where the assailant is located?

THE COURT: Yes, Ma'am.

A. Right here (indicating).

THE COURT: I'm going to let the record indicate that the witness pointed her finger towards the accused in this indictment who is now standing trial. Go ahead.

Q. Now, Mrs. [R.], the individual that you have pointed out for us, is this particular person, the person that you described, was he in the back of the car or was he the driver?

A. He was in the back of the car.

. . . .

Cross Examination

Q. Here's the question, Ma'am: (Reading from transcript:) "They came over to General Seafood and showed you six or seven pictures?" And "yes," was your answer. "Not down at the police station?" Answer: "No." "Okay. Was it six or was it seven?" And your answer was: "I don't know. I only looked at two, because he was the second one." As it indicates here, you only looked at two pictures? Are you able to clarify that statement at this time?

A. I remember he was the third one that I saw. The third picture that I saw.

Q. Do you recall what you said at the time—

THE COURT: Or Mr. Atkins suggests that you looked at two pictures back when you were talking about—and assuming Mr. Atkins has a correct transcript. I would kind of vouch for you that Mr. Atkins wouldn't just go forge a transcript. Assuming that the answer was correctly taken down as Mr. Atkins read it, is there any explanation that you may help Mr. Atkins with to clarify what he now tells you that you said? If you can clarify it in any way. You can search your mind.

THE WITNESS: Well, in my mind, I would say it was the third. It could have been the second. I don't know. I don't recall. I just recall that the one—when I saw him, I said, that's him. And I handed them that photograph and said, that's him. And they said, you know—

THE COURT: Well, but go ahead. Did they suggest—

Syllabus Point 4, *State v. Harless,* 168 W.Va. 707, 285 S.E.2d 461 (1981).

Clearly an "array" of one photograph is impermissibly suggestive. However, Mr. James again provides no direct evidence that Ms. R. ever saw a lone photograph. In fact, Ms. R. denied that this occurred. Single photograph identifications raise grave concern about the reliability of the witness's identification, and this Court will not accept them. However, there is no evidence in this case on which to base a reversal of the trial court's decision.

### IV.

For the foregoing reasons, the decision of the Circuit Court of Kanawha County is affirmed.

Affirmed.

THE WITNESS: They suggested that I look and I said, this is him.
THE COURT: Well, but you've been over that. You mean they suggested that you continue to look?
THE WITNESS: Yes, sir.
THE COURT: I see. Well, be specific about that because I wasn't there and neither was Mr. Atkins, and we can only know what you tell us about it. Go ahead, Paul Atkins.
Q. Ma'am, then you were required to look at additional pictures?
A. Yes, I mean, I didn't really look at them because I didn't need to. They suggested that I look at them, but I didn't need to look at them.
Q. Do you recall at the time if that was a very good likeness to the defendant in this case, your assailant?
A. Yes.
Q. Do you recall exactly what it was in your own mind that made you certain that it was Larry James here?
A. Well, I know it was him because I looked at him. I know it was him. Someone assaulting you for that long, you know what they look like.