510 S.E.2d 790

**STATE of West Virginia ex rel. Charles John YEAGER, Appellant,**

v.

**George TRENT, Warden, West Virginia Penitentiary, Appellee.**

**No. 25011.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1998.

Decided Dec. 8, 1998.

Lonnie C. Simmons, Esq., Law Office of P. Rodney Jackson, Charleston, West Virginia, Attorney for Appellant.

Robin Welch, Esq., Special Prosecuting Attorney, for Logan County, Looneyville, West Virginia, Attorney for Appellee.

PER CURIAM:

This is an appeal from the September 11, 1997, final order of the Circuit Court of Logan County denying the Appellant, Charles John Yeager, habeas corpus relief,[1] arising out of the Appellant's September 2, 1988,[2] jury conviction for the first degree murder of Mark Fillinger, without a recommendation of mercy. The Appellant argues that the trial court erred in refusing to set aside the Appellant's conviction and award a new trial where the State, in the underlying trial, failed to disclose its agreement with a critical witness regarding criminal charges pending against the witness, said disclosure being material in nature.[3] Based upon our review of the parties' arguments, the record, and all other matters submitted to this

---

1. The petition for appeal from the denial of habeas corpus relief was originally filed on November 3, 1997. On or about January 21, 1998, the petition was presented to this Court and was refused. On February 19, 1998, the Appellant and the Appellee, Carl E. Legursky, filed a "Joint Motion for Renewal of Petition for Appeal," which motion was granted by the Court.

2. The Appellant's direct appeal of this conviction was denied by this Court on July 12, 1989.

3. The special prosecuting attorney assigned to this case agrees that the Appellant is entitled to a new trial.

Court, we reverse the decision of the lower court and remand this case for a new trial.

## I. UNDERLYING TRIAL FACTS [4]

On June 26, 1987, Mark Fillinger was released from the Logan County Jail on a short pass for an interview, but did not return to jail at the scheduled time. Instead, he joined a group of people at the Appellant's house, including the Appellant, Eric Freeman,[5] Stephen Lee Workman and Steven Todd Martin,[6] for a night of drinking and consuming various drugs, including Quaaludes.

At some point that evening, according to Mr. Workman's testimony, Mr. Fillinger stole a motorcycle belonging to Mr. Workman, but wrecked it after going down the road a short distance from Appellant's house. When he confronted Mr. Fillinger about the motorcycle, Mr. Workman stated that he accused Mr. Fillinger of stealing his bike and proceeded to hit him several times with his fists. Later that evening, the group went to the local cemetery to continue drinking and consuming drugs. Mr. Workman testified that during the course of the evening, the Appellant argued with the victim for not charging anyone for the drugs. According to Mr. Workman, the Appellant called the victim a rat, and pointed to a grave, stating that that is where the victim should be. At that time, the victim struck the Appellant in his back[7] and then the victim ran over a hill. Mr. Workman further testified that Eric Freeman ran after the victim, tackling him and then beating him with his fists. The Appellant then began stomping on the victim about eight or ten times in the chest and stomach area. He stated that when he left the area, the victim was just laying there and he assumed he was dead. Mr. Workman testified that he saw no weapon used against the victim and none of the Appellant's blows were to the victim's head. Finally, according to Mr. Workman, the next day he, Mr. Freeman and Mr. Martin were instructed by the Appellant to return to the cemetery to bury the victim's body. Mr. Workman testified that he acted as a lookout, while Mr. Freeman and Mr. Martin dug a grave and placed the victim's body into that grave.

Mr. Martin's testimony was similar to Mr. Workman's in that he also testified that after the victim stole Mr. Workman's motorcycle, Mr. Workman hit the victim a couple of times. The victim and Mr. Martin then returned to the Appellant's home. Upon their return, Mr. Martin testified that the Appellant stated to the victim "I should kill you for taking this bike. . . ." Mr. Martin also testified that once they arrived at the cemetery, the victim was clearing brush.[8] Then, the victim tried to run, but was tackled by Mr. Freeman. At that time, according to Mr. Martin, the Appellant began stomping on the victim, while Mr. Freeman held the victim down. Mr. Martin stated that the Appellant beat the victim for ten to fifteen minutes, but never used a weapon against the victim. Mr. Martin testified that he saw the victim get up after the altercation. He and the victim once again began clearing brush at the Appellant's

4. Many of the recited facts originate from the findings of fact found in the agreed order submitted by the Appellant and the Appellee to the circuit court in December of 1996. These factual findings were adopted by the circuit court and incorporated by it in the September 11, 1997, final order.

5. Eric Freeman was also indicted for Mr. Fillinger's murder. Mr. Freeman refused to testify at the Appellant's trial by asserting his Fifth Amendment right against self-incrimination. Subsequent to the Appellant's trial, Mr. Freeman entered into a plea bargain which required him to plead guilty to one charge of malicious assault and one charge of voluntary manslaughter relating to the victim's death. During a January 15, 1992, hearing conducted with regard to the Appellant's habeas corpus proceeding, Mr. Freeman testified that the Appellant did not kill Mr.

Fillinger. Mr. Freeman stated that "[a]s far as . . . [he] kn[e]w . . . [he]" killed the victim. Additionally, Mr. Freeman stated that when the Appellant left the crime scene on the night of the murder, the victim was still alive.

6. On August 21, 1987, Stephen Lee Workman and Steven Todd Martin were charged with being accessories after the fact to Mr. Fillinger's murder.

7. Mr. Workman stated that it appeared to him from the Appellant's wounds in his back that the victim must have had a knife when he struck the Appellant.

8. The Appellant testified that they all engaged in clearing brush off of the graves of some of his family members.

request. Mr. Martin then testified that he left the area. Upon his return, he saw Mr. Freeman digging a grave with a mattock. Mr. Martin testified that the Appellant was standing beside the grave and the victim was nowhere to be found. He stated that he noticed a cut on Appellant's back. He further stated that the Appellant ordered him to dig some of the grave. Mr. Martin then helped to cover the body.

The Appellant testified that while he was clearing brush off graves in the cemetery, he was stabbed in the back with a knife by the victim. The Appellant testified that he did not know what prompted the victim to stab him. He denied making any statements that the victim was a rat; that he ought to kill the victim; or that the victim should be in a grave. He admitted to kicking the victim about ten times. The Appellant stated, however, that he stopped when he became weak from the blood loss he was experiencing because of the knife wound. He stated that he was barefooted when he kicked the victim and he denied that Mr. Freeman held the victim down while he was kicking him. He further stated that after he finished kicking the victim, the victim was conscious and talking. The Appellant testified that he then left the cemetery. At that time, Mr. Workman was on top of the victim beating him in the head, according to the Appellant's testimony. He stated that he returned to his home where his wife helped clean his wound. Later that day, Mr. Freeman and Mr. Martin came to his home. Mr. Freeman was crying at that time and stated that he had killed the victim. When Mr. Freeman and Mr. Martin left the Appellant's home, they stated that they were going to bury the victim, according to the Appellant's testimony. Finally, the Appellant denied killing the victim.

Further evidence offered at the Appellant's trial included the testimony of Dr. Irwin Sopher, who performed the autopsy on the victim. Dr. Sopher testified that the victim died from a blunt force impact to the left rear portion of his head, which resulted in an extensive fracture of the skull bone.

According to Dr. Sopher, the weapon used to inflict this injury was a pipe-like object. Dr. Sopher also stated that there were other wounds to the victim's head that were consistent with wounds inflicted by a knife. Dr. Sopher testified that he found no other significant wounds on the victim's body.

The State offered no evidence that the Appellant used any type of a weapon in striking the victim. The State offered the testimony of Timothy Perry to support Dr. Sopher's opinion regarding the cause of death. Mr. Perry testified that in July of 1987, about two weeks before the victim's body was discovered, he was drinking grain alcohol at Mr. Martin's residence when the Appellant and Mr. Freeman arrived. Mr. Perry stated that at some point during the evening, he overheard the Appellant and Mr. Martin having a conversation in the bathroom regarding the victim. Mr. Perry testified that he heard the Appellant state that he had hit the victim with a baseball bat and Mr. Freeman had stabbed the victim twice with a knife. Later in December of 1987, Mr. Perry admitted to several officers and the prosecutor that this statement was not true. Mr. Perry stated at trial, however, that his testimony was accurate.[9]

At the close of all the evidence, the Appellant was convicted of the first degree murder without a recommendation of mercy. The Appellant is currently serving his sentence in the Mount Olive correctional complex.

## II.  HABEAS CORPUS FACTS

Before the Appellant's trial, pursuant to West Virginia Rule of Criminal Procedure 16, his defense counsel filed a motion for discovery of any plea agreements with any of the witnesses, which included Stephen Lee Workman. The State denied the existence of any such agreements with respect to this witness. On February 2, 1990, approximately one and a half years after testifying against the Appellant at his trial, the criminal charges against Mr. Workman were dismissed by the Assistant Prosecuting Attorney Thomas A. Zamow.[10]

---

9. At trial, Mr. Martin was never asked about this conversation testified to by Mr. Perry.

10. The criminal charges against Mr. Martin were also dismissed on February 2, 1990. The Appellant attempted to develop a record showing the

Prior to the testimony of Stephen Lee Workman, an in camera hearing was held where the lower court asked the State whether there was any plea bargains or agreements with Mr. Workman. The State denied the existence of any such agreements. Once again, in front of the jury on direct examination, Mr. Workman denied that any promises had been made to him with regard to the pending criminal charge in exchange for his testimony.

As part of the habeas corpus proceeding below, the deposition of the former Logan County Prosecuting Attorney, Donald C. Wandling, was taken on March 24, 1995. Mr. Wandling testified that it was his recollection that a plea agreement existed between the State and Mr. Workman.[11] Pursuant to the agreement, Mr. Workman was to plead guilty to misdemeanor charges in magistrate court, in exchange for his testimony in the Appellant's trial. Mr. Wandling further stated that to his recollection there would not have been anything reduced to writing when the plea agreement was reached.

The deposition of George L. Partain, who was appointed to represent Mr. Workman in the underlying criminal matter, was taken on August 3, 1994. In his deposition, Mr. Partain stated that he conferred with Mr. Zamow on the magistrate court charges against Mr. Workman and conferred with Mr. Wandling on Mr. Workman's involvement in the Appellant's trial. He stated that he entered into a written agreement[12] with the State extending the statute of limitations against Mr. Workman. Mr. Partain testified that in his experience in handling appointed criminal cases, Mr. Workman was the only client he allowed to testify without the benefit of a plea agreement of some kind. Although Mr. Partain denied any such plea agreement, he testified that it was his understanding that if his client's testimony bore out at the Appellant's trial, "they would drop his [Mr. Workman's] case at some point."

Mr. Workman testified during his deposition,[13] that he had no understanding that the charges against him would be dropped if he testified in the Appellant's trial. Mr. Workman testified that he knew about the continuance agreement, but he did not think it was the type of agreement that he needed to disclose during questioning by the defense. Additionally, Mr. Workman testified that he did not know that the charges against him had been dismissed until he was informed of that fact at his deposition.[14]

By letter dated April 17, 1995, Mr. Wandling informed the lower court that he "may have inadvertently testified incorrectly concerning a matter in the deposition." He went on to state in the letter that there was no plea agreement between the State and Mr. Workman prior to the Appellant's trial. This recantation of his deposition testimony was based on the fact that "[t]he trial transcripts clearly show that I represented to the

existence of a plea agreement or some type of inducement granted by the State in exchange for Mr. Martin's testimony. Both Mr. Martin and his court-appointed attorney in the underlying matter, Mr. John C. Valentine, denied the existence of any such agreement. As a matter of fact, Mr. Valentine testified during his deposition in the Appellant's habeas corpus proceeding, that there were no plea discussions or agreements prior to Mr. Martin's testimony. Further, the State also requested Mr. Valentine to enter into a continuance of the magistrate court case on his client's behalf. Mr. Valentine stated that he refused to agree to a continuance because he believed he had a good basis for dismissal of the case pursuant to the three-term rule.

**11.** The prosecutor also recalled the existence of such agreement with Mr. Martin as well.

**12.** A copy of this formal written agreement was not in the court file. The time records filed by

Mr. Partain to obtain his fee as appointed counsel, however, reflected time spent preparing an agreement. Mr. Valentine also corroborated Mr. Partain's testimony regarding the existence of a continuance agreement. Mr. Partain never produced a copy of the alleged agreement.

**13.** Mr. Martin's deposition testimony concerning the charges being dropped and the charges being dismissed was the same as Mr. Workman's.

**14.** James D. Vickers testified at the Appellant's habeas corpus hearing. He had previously been incarcerated at the West Virginia Penitentiary with the Appellant and he spoke to the Appellant about his testimony. Mr. Vickers stated that he was out one night with Mr. Workman and Mr. Martin and "[t]hey said if they didn't get their story straight that the prosecutor wasn't going to break them a deal. They said the prosecutor said if they'd testify against John Yeager they wouldn't get a day out of it."

court that there was no plea agreement between Steven Workman or Todd Martin prior to the trial of John Yeager."

Based upon this letter, the lower court suggested that Mr. Wandling be deposed again. At his second deposition, Mr. Wandling testified that he was convinced he was wrong in his first deposition when he read the part of the trial transcript where he had represented to the trial court that there were no agreements with either Mr. Workman or Mr. Martin. Mr. Wandling could not explain his confusion as to the existence or nonexistence of plea agreements in his first deposition. Further, Mr. Wandling believed that the testimony of Mr. Workman and Mr. Martin was critical to the conviction of the Appellant and that no conviction would have been obtained without their testimony. Mr. Wandling also testified that he did not consider the continuance of Mr. Workman's magistrate court trial, agreed to by himself and Mr. Workman's attorney, as something he would have had to disclose to the court.

### III. LAW

The sole issue before this Court is whether the trial court erred in refusing to set aside the Appellant's conviction and award a new trial where, during the underlying trial, the State failed to disclose an agreement with a critical witness regarding criminal charges pending against that witness. If such a failure to disclose is present, the question becomes whether the failure to disclose was material under the facts of the Appellant's case.

The Appellant asserts that Mr. Workman was a critical witness against him at his trial. The Appellant argues that the evidence developed in the habeas corpus proceeding clearly indicates that the trial court and the jury were misled by Mr. Workman and the prosecutor with respect not only to the agreement Mr. Workman had with the State to continue his criminal charges until after he testified at the Appellant's trial, but also with

respect to a plea agreement entered into between the State and Mr. Workman in exchange for Mr. Workman's testimony.

### A. FAILURE TO DISCLOSE

In syllabus points one of *State v. James,* 186 W.Va. 173, 411 S.E.2d 692 (1991), this Court held that *"[t]he prosecution must disclose any and all inducements given to its witnesses in exchange for their testimony at the defendant's trial." Id.* at 174, 411 S.E.2d at 693, Syl. Pt. 2 (Emphasis added). This holding was based upon the rationale that "[s]uch deals are crucial as impeachment evidence; in some cases the jury may decide that the deal has created an incentive for the witness to lie." *Id.* at 175, 411 S.E.2d at 694. We concluded in *James* that "[c]lear evidence of a deal directly linking leniency for ... [a witness] with testimony tending to convict ... [the defendant] that was not disclosed would be grounds for a new trial." *Id.*

In the present case, it is clear that direct evidence was presented through the prosecutor's deposition at the habeas corpus proceeding which established the existence of what clearly could be construed as a plea agreement between the State and Mr. Workman, wherein the criminal charges against Mr. Workman would be dismissed in exchange for his testimony which was favorable to the State's case. Because the prosecutor later recanted and completely reversed his position on this issue, there is evidence on both sides of this question and thus, we cannot unequivocally state that the plea agreement existed. It is troubling that the question of whether or not a plea agreement existed is so unresolved that even the prosecuting attorney is on the record as adopting two opposite positions with respect to whether there was a plea agreement. This is, at a minimum, sloppy practice. This entire scenario illustrates why, although there is no rule requiring that plea agreements be in writing, it clearly is the better practice.[15]

---

15. We have previously stated that " '[w]hile we do not require that a plea bargain agreement be written, ... that is the far better course....' " *State v. Sharpless,* 189 W.Va. 169, 172, 429 S.E.2d 56, 59 (1993) (emphasis omitted)(quoting *State v. Wayne,* 162 W.Va. 41, 42, 245 S.E.2d 838, 840 (1978), *overruled on other grounds, State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983)). While Rule 11(e) of the West Virginia Rules of Criminal Procedure does not require that a plea agreement be in writing, it mandates that "[i]f a plea agreement has been reached by the parties,

The Appellant relies more heavily on the agreement to continue, than on the alleged plea agreement. The reason for that position seems clearly to be based on the fact that the existence of the agreement to continue is clearly demonstrable. It is the existence of a plea agreement itself, however, which is of greater concern. In cases such as this, where there is doubt over the existence of an agreement between the State and a defendant, but substantial evidence, although circumstantial, is present which suggests that an agreement existed, this Court will resolve the benefit of the doubt in the defendant's favor. *See State v. Wayne*, 162 W.Va. 41, 42–43, 245 S.E.2d 838, 840 (1978), *overruled on other grounds, State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)("[W]e do require substantial evidence that the bargain was, in fact, a consummated agreement, and not merely a discussion.")

Certainly, in the instant case, the agreement continuing the criminal charges against Mr. Workman until after he testified in the underlying criminal trial [16] against the Appellant seems to support or at least suggest the existence of a plea agreement. Additionally, the prosecuting attorney initially testified that a plea agreement existed. Likewise, there was Mr. Workman's attorney's testimony that if his client's testimony supported the State's case against the Appellant, "they would drop his [Mr. Workman's] case at some point." Moreover, as further support that a plea agreement existed, the criminal charges against Mr. Workman were dismissed after he testified in the Appellant's criminal trial. Finally, it is undisputed that neither the plea agreement, nor the ancillary agreement to continue, was disclosed to either the lower court or the Appellant during the proceeding below as requested.

## B. MATERIALITY ISSUE

Having established that the State withheld evidence of a plea agreement from both the Appellant and the lower court, the inquiry becomes whether the failure to disclose was material under the facts of the Appellant's case. The Appellant asserts that the failure to disclose was material to the Appellant's trial and ultimate conviction.

In syllabus point two of *In re an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993), this Court held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, *such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.*" *Id.* at 322, 438 S.E.2d at 502 (Emphasis added); *see* Syl. Pt. 4, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989) (" 'A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.' Syllabus Point 4, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982).") We elaborated on the materiality standard in *Fortner* as follows: " 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " 182 W.Va. at 354, 387 S.E.2d at 820 (quoting *United States v. Bagley*, 473 U.S.

---

the court shall, on the record, require the disclosure of the agreement in open court or, on a showing of good cause, in camera, at the time the plea is offered." W. Va. R.Crim. P. 11(e)(2); *see United States v. Norman*, 133 F.3d 930, 1997 WL 812259 (9th Cir.1997) (unpublished per curiam) ("Rule 11(e) of the Federal Rules of Criminal Procedure contains no requirement that the plea agreement be in writing."); *United States v. Frost*, 43 F.3d 1469, 1994 WL 706121, at *2 (4th Cir.1994) (unpublished per curiam) ("There is no requirement that a plea of guilty be accompanied by a written plea agreement."); *but see* W. Va. R.Crim. P. 11(a)(2) (requiring that a conditional plea agreement "reserv[e] in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion.")

**16.** Without the continuance, the one year statute of limitations on the misdemeanor criminal charges filed against Mr. Workman on August 21, 1987, would have expired prior to the beginning of the Appellant's trial on the underlying criminal charges, which was scheduled to begin on August 30, 1988.

667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Finally, we recognized that "evidence reflecting on the credibility 'of a key prosecution witness may be so material to the issue of guilt as to qualify as exculpatory matter which the prosecution is constitutionally required to disclose." *Fortner*, 182 W.Va. at 354, 387 S.E.2d at 821.

Based upon our review of Mr. Workman's testimony in the underlying criminal trial, as well as the facts developed during the habeas corpus proceeding, we conclude that the failure to disclose the plea agreement between the State and Mr. Workman was material to the impeachment of a critical witness, because the witness presented testimony that was critical to the Appellant's conviction and the witness incriminated himself in his testimony, thereby enhancing his credibility. Mr. Workman was the only witness who claimed to have heard the Appellant arguing with the victim for not charging for the Quaaludes, referring to the victim as a rat, and pointing to a grave, saying that this is where the victim ought to be. Further, the State had a need to bolster Mr. Workman's credibility, because even though his credibility was enhanced by his incriminating testimony, he admitted to lying to the police in a statement he had given to them. Consequently, had the Appellant been informed about the plea agreement, he could have subjected Mr. Workman to extensive cross-examination that could have impacted upon the witness' credibility. Without having the opportunity to ask these questions in front of the jury, we conclude that the Appellant was deprived of a significant opportunity to challenge Mr. Workman's credibility.

## IV.

Based on the foregoing, the final order of the Circuit Court of Logan County is hereby reversed and this case is remanded for a new trial.

Reversed and remanded.

Justice McGRAW did not participate in the decision of this case.