**FILED**

**June 10, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Gary Lee Rollins,**
**Petitioner**

**vs.) No. 20-0149** (Nicholas County 15-C-29)

**Donnie Ames, Superintendent,**
**Mount Olive Correctional Complex,**
**Respondent**

**MEMORANDUM DECISION**

Petitioner Gary Lee Rollins ("Petitioner"), by counsel Kevin W. Hughart, appeals the January 21, 2020, order of the Circuit Court of Nicholas County denying his petition for a writ of habeas corpus. Respondent Donnie Ames, Superintendent, Mount Olive Correctional Complex, by counsel Patrick Morrisey and Michael R. Williams, filed a response in support of the circuit court's order.

The Court has considered the parties' briefs, oral arguments, and the record on appeal. Upon review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was convicted of first-degree murder without a recommendation of mercy following a jury trial in 2012. This Court affirmed his conviction in *State v. Rollins*, 233 W. Va. 715, 760 S.E.2d 529 (2014). The decedent was Petitioner's wife, Teresa Rollins ("Ms. Rollins"). She died while pinned underwater by a fallen tree in a pond on the family's farm. An employee who worked on the farm, April Bailes ("Ms. Bailes"),[1] called 911 to report the death. At the time of Ms. Rollins's death, Ms. Bailes and Petitioner had been engaging in an affair for approximately one year. The death was initially determined to be an accidental drowning. As noted by the Court in *Rollins*, the investigation was reopened:

> According to [Petitioner], Ms. Rollins's family
> contacted then Governor Joe Manchin about the investigation,

---

[1] April Bailes has also been identified as "April O'Brien" and "April O'Brien-Bailes." For ease of the reader, we refer to her as "Ms. Bailes."

1

indicating their belief that Ms. Rollins's death was the result of murder, not accident. The record indicates that former Governor Manchin then called the head of the West Virginia State Police and instructed the State Police to conduct an investigation. Upon completing their investigation, the State Police concluded that Ms. Rollins's death was not an accident.

*Id.* at 724, 760 S.E.2d at 538.

The conclusion that Ms. Rollins's death was not an accident was based on three primary factors. First, the investigation revealed that Petitioner took out multiple life insurance policies on Ms. Rollins within two months prior to her death. Second, the State Police found Ms. Bailes's 911 call reporting Ms. Rollins's death to be "highly suspicious." This Court described the nature of this "highly suspicious" phone call in *Rollins*:

According to the statements of all witnesses present at the Rollinses' farm, upon discovering Ms. Rollins's body, Mr. Rollins ran up the hill shouting for someone to call an ambulance. At that time, Mr. Rollins did not explain why they should call an ambulance. Ms. Bailes made the 911 call after retrieving her phone from her vehicle. The point from which she made the call was approximately eighty-five yards from where Ms. Rollins lay in the pond, yet she told the 911 operator that Ms. Rollins was trapped under a tree in the pond and that Ms. Rollins was not breathing. The State Police theorized that because Ms. Bailes could not see the scene at the pond with the detail she described to the 911 operator, she must have known that Ms. Rollins was dead in the pond prior to placing the call.

*Id.* at 725, 760 S.E.2d at 539.

Finally, the State Police found that Petitioner's description of what he did upon seeing his wife trapped in the pond did not match the testimony of other witnesses on the scene. Specifically, Petitioner claimed that he jumped into the pond in an attempt to save Ms. Rollins. However, witnesses on the farm stated that Petitioner was "either completely dry or wet only up to his knees shortly after Ms. Rollins's body was removed from the pond." *Id.*

Following this investigation, Petitioner was indicted for the murder of Ms. Rollins. Ms. Bailes was charged by complaint as an accessory to this murder based on the belief that she knew Ms. Rollins was dead prior to calling 911. Ms. Bailes denied any knowledge of foul play during the time between Ms. Rollins's death and the time Petitioner was charged. However, after Ms. Bailes was arrested and charged as an accessory, she told

2

the police that Petitioner took her aside on the morning of Ms. Rollins's death and admitted that he killed her.

The State's evidence at trial consisted of 1) Ms. Bailes's testimony that Petitioner had confessed to her that he killed his wife; 2) testimony regarding the life insurance policies; 3) testimony of witnesses at the farm on the day Ms. Rollins died; 4) testimony from three medical expert witnesses who all stated that they did not believe the injuries to Ms. Rollins's body were extensive enough to have been caused by a falling tree; and 5) testimony of a friend of Ms. Rollins who claimed that Petitioner had physically abused Ms. Rollins in the months prior to her death. During the trial, Ms. Bailes testified and denied that she had been promised anything in exchange for her testimony.

Petitioner's defense was that Ms. Rollins's death was an accident. Further, Petitioner argued that the case was reopened based on the former governor's request and influence. Petitioner called an expert, Dr. Cohen, who testified that he believed a falling tree could have caused Ms. Rollins's death.[2] During closing arguments, counsel for Petitioner argued that Ms. Bailes's testimony was not credible:

> She's joined their team. She's gotten on the—the governor's freight train express. We're all going to railroad Gary Rollins, so now what does she get out of it. She's not in jail. She's not been indicted. You heard that she was arrested. She was taken before a magistrate, but she's not been indicted. You can't get convicted if you're not indicted.
>
> Who hands out the indictments? That man right there. (Indicated.) P.K. Milam [the prosecutor]. Is he going to indict his star witness, do you think? Is that what's really going to

---

[2] In *Rollins*, this Court summarized the expert medical testimony presented by the State and the defense as follows:

> All four of the medical expert witnesses at trial—the State's three witnesses and the defense's one witness—agreed that Ms. Rollins's body did not present with any large hemorrhages or broken bones. They also agreed that based on her wounds, the tree could not have knocked her unconscious and that she was conscious when she was submerged in the water. The witnesses disagreed primarily on the amount of bruising on Ms. Rollins's back and in their ultimate conclusions.

*Id.* at 726, 760 S.E.2d at 540.

happen here? After all is said and done, he gets his conviction
thanks to her lie, he's going to repay that by indicting her? Do
you think they thought that?

In the State's rebuttal argument, the prosecutor, Mr. Milam ("Prosecutor Milam"), asserted that there was no agreement with Ms. Bailes and that he was planning on indicting her for being an accessory to the murder:

[W]e interviewed her again and again and again and gave her
every opportunity in the world to help herself, and she didn't,
and she got arrested for it, and she's charged with accessory
after the fact. Now, he wants you to believe that she's getting
some kind of consideration out of that. You can bet your behind
that I'm going to indict her next month.

The jury found Petitioner guilty of first-degree murder without a recommendation of mercy. The trial court sentenced Petitioner to life without the possibility of parole. Following his conviction, Petitioner filed a direct appeal with this Court, raising seven assignments of error.[3] This Court affirmed his conviction and sentence in *Rollins*.

Petitioner, by counsel, filed an amended habeas petition on November 7, 2017. Relevant to the instant matter, Petitioner asserted that he was prejudiced when Prosecutor Milam failed to disclose that the State had reached a plea agreement with Ms. Bailes. Further, Petitioner argued that Prosecutor Milam erroneously told the jury that he intended to indict Ms. Bailes. Next, Petitioner argued that he was "materially prejudiced" because one of the jurors was related to a witness for the State. Finally, Petitioner asserted that his trial and appellate counsel were ineffective.

The circuit court ("habeas court") held a two-day omnibus evidentiary hearing in 2019. The main issue was whether a plea agreement between the State and Ms. Bailes had been reached before she testified at Petitioner's trial. Three witnesses offered

---

[3] Petitioner argued that: 1) he was prejudiced by a remark made by the prosecutor during closing arguments; 2) the circuit court erred by refusing to strike a juror during voir dire; 3) the circuit court erred by failing to strike a biased juror upon discovering a previous relationship between that juror and the prosecutor; 4) the circuit court erroneously permitted the presentation of evidence of domestic violence; 5) the State's presentation of three medical expert witnesses was cumulative and prejudicial; 6) he was subjected to unfair surprise when one of the State's medical expert witnesses testified in a manner inconsistent with his report; and 7) the cumulative effect of the alleged errors warranted reversal.

extensive testimony on this issue during the omnibus hearing: 1) Ms. Bailes, 2) Ms. Bailes's attorney, Cynthia Stanton ("Ms. Stanton"), and 3) Prosecutor Milam.

Ms. Bailes testified that she believed there was a plea agreement providing that if she testified at Petitioner's trial, she would not be charged. She could not remember who made that promise to her. When asked if Prosecutor Milam agreed not to prosecute her if she testified, she stated, "I don't think so. I don't remember how all that came about." However, Ms. Bailes acknowledged that she had given a deposition in which she testified that it was Prosecutor Milam who promised not to prosecute her if she testified. Ms. Bailes also testified that: 1) no one, including Prosecutor Milam, told her to keep the plea agreement secret; 2) she never signed a plea agreement; and 3) her lawyer, Ms. Stanton, did not go over the terms of a plea agreement with her.

Ms. Bailes conceded that during Petitioner's trial, she testified that she had not been promised anything in exchange for her testimony. She was then asked by Petitioner's counsel, "[a]s you sit here today [at the omnibus hearing], you were promised that you would not be prosecuted in exchange for your testimony, is that correct?" She replied, "Yes." However, during cross examination, Ms. Bailes was asked whether she testified truthfully during the trial and she replied, "Yes." Additionally, Ms. Bailes and counsel for the State had the following exchange:

Q. Ms. Bailes, in the three times you've testified under oath in this matter – being the trial, your deposition, and now here today, which time would your memory be better about all these events?
A. At the trial.
Q. Back then?
A. [Nodding.]
Q. Did you tell the truth then?
A. Yes.

Prosecutor Milam testified that the State did not have an agreement with Ms. Bailes. He stated that he had never granted immunity to someone in a murder case without putting the agreement in writing. Further, Prosecutor Milam testified that he intended to indict Ms. Bailes following Petitioner's trial. However, after researching the potential criminal charge against Ms. Bailes, he determined that an employee could not be prosecuted as an accessory-after-the-fact for the criminal acts of her employer.

Ms. Stanton represented Ms. Bailes during Petitioner's trial. She testified that she negotiated a plea agreement with Prosecutor Milam at a preliminary hearing in magistrate court in October of 2011. According to Ms. Stanton, this was an oral agreement

5

that was never reduced to writing.[4] Ms. Stanton described the terms of the plea agreement as follows: "[t]hat, depending on the veracity of her [testimony], she would either have her charges dismissed or she would plead to a misdemeanor with no jail time."

Ms. Stanton admitted that she received a letter from Petitioner's trial counsel prior to the trial asking if Ms. Bailes and the State had reached a plea agreement. This letter requested that Ms. Stanton respond in writing. Prosecutor Milam also received a copy of this letter. Ms. Stanton did not reply to this letter. She explained that her failure to reply to the letter was based on her disdain for Petitioner's trial counsel. Ms. Stanton was asked if Prosecutor Milam asked her not to disclose the plea agreement to Petitioner's trial counsel. She replied, "No, I made that decision." Following the trial, Ms. Stanton testified that she met with the circuit court judge and Prosecutor Milam and informed them that she had an ethical duty to report Prosecutor Milam for an ethics violation based on his statement at trial that he intended to prosecute Ms. Bailes, which was counter to the oral plea agreement.

During cross-examination, Ms. Stanton agreed that the plea agreement could have changed based on the quality of Ms. Bailes's trial testimony: "Yeah, it [the plea agreement] could have changed. . . . It could have changed. If she had not done well on the stand, I believe it could have – she would have had to plea to a misdemeanor." Petitioner's counsel asked Ms. Stanton if Prosecutor Milam "kept his agreement with you and your client." She replied, "[t]he charges were dismissed by [Circuit Court] Judge Johnson, not by [Prosecutor] Milam." Ms. Stanton explained that Judge Johnson dismissed the charges "after three terms of inaction." When asked if she knew that this was "going to be the manner . . . in which the case was dealt with," Ms. Stanton stated, "I suspected that. After I went to the judge, I suspected that would be what would happen." While ultimately testifying that Prosecutor Milam "upheld his end of the bargain," Ms. Stanton stated that Prosecutor Milam "wasn't the one that actually dismissed it, but, no, she was not indicted, and that was the plea agreement, but Judge Johnson's the one that actually dismissed it."

The habeas court entered a twenty-page order denying Petitioner's habeas petition on January 21, 2020. The court set forth a detailed discussion explaining its conclusion, based on the totality of the evidence, that a plea agreement did not exist:

Based on the extensive questioning of April Bailes in the omnibus hearing on various questions involving her recall of

---

[4] Ms. Stanton testified that this was a common practice. She explained that a motion was filed to waive the time limit of Ms. Bailes's preliminary hearing and that the motion included the notation "further investigation." She stated that when such a motion would include this notation ("further investigation"), it meant that there was either a plea agreement or that plea negotiations were underway.

6

events, it appears the most accurate assessment is that what she said at trial was fresh in her mind and was the most accurate statement of events, compared to any later statements she made to the contrary either in a deposition or in the omnibus hearing itself.

. . . .

[I]t is undisputed that the terms of any plea agreement in this case were never reduced to writing. Ms. Stanton also testified that her understanding was that either her client would not be prosecuted, or she would be allowed to plead guilty to a misdemeanor. The ambiguity of Ms. Stanton's description of the supposed plea agreement lends itself to the conclusion that no agreement with clear, specific terms was in place.

. . . .

This State's Supreme Court of Appeals has stated regarding oral plea agreements, "While we do not require that a plea bargain agreement be written, although that is the far better course, we do require substantial evidence that the bargain was, in fact, a consummated agreement, and not merely a discussion." *State v. Wayne*, 162 W. Va. 41, 42-43, 245 S.E.2d 838, 840 (1978), *overruled on other grounds*, *State v. Kopa*, 173 W. Va. 43, 311 S.E.2d 412 (1983). . . . Ultimately, the Court finds this to be the decisive factor in determining whether there was a "secret" plea bargain of some kind struck in this case.

. . . .

[T]he prosecuting attorney has never acknowledged any agreement, and the agreement alleged to have existed by counsel for the defendant was not one with definiteness and performance. Based on the totality of the evidence, the Court FINDS that there was no plea agreement or immunity agreement between the State and April Bailes when she testified at the trial of the petitioner.

After entry of the habeas court's order denying the habeas petition, Petitioner filed the instant appeal.

This Court's standard of review is as follows:

7

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006). With this standard in mind, we proceed to examine the parties' arguments.

Petitioner raises three main arguments: 1) the habeas court erred by finding that there was no plea agreement between the State and Ms. Bailes; 2) the habeas court erred by finding that he was not "materially prejudiced" because one of the jurors was related to a witness for the State; and 3) he is "entitled to relief based upon the cumulative error doctrine." We consider each of these arguments in turn.

The crux of Petitioner's first argument is that he was prejudiced in multiple ways because of a secret plea agreement between the State and Ms. Bailes. By hiding this plea agreement, Petitioner contends that 1) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963); 2) Prosecutor Milam falsely told the jury that he intended to indict Ms. Bailes; and 3) the State relied on Ms. Bailes's perjured testimony that there was no plea agreement. Petitioner's assertions of prejudice are all premised on his contention that there was a secret plea agreement between the State and Ms. Bailes. Thus, our threshold issue is determining whether the habeas court erred by concluding that there was not a plea agreement.

The resolution of this issue turns on the habeas court's factual findings. As previously stated, we review the habeas court's factual findings under a clearly erroneous standard. *See* Syl. Pt. 1, *Mathena*, 219 W. Va. 417, 633 S.E.2d 771. We have observed that "[a] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Board of Educ. v. Wirt*, 192 W. Va. 568, 579 n. 14, 453 S.E.2d 402, 413 n. 14 (1994) (internal citation and quotation omitted). Similarly, this Court has held that "[f]indings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong." Syl. Pt. 2, in part, *State ex rel. Thompson v. Ballard*, 229 W. Va. 263, 728 S.E.2d 147 (2012) (internal citation and quotation omitted). This Court has also noted that "a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the [lower tribunal's] account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In Re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

The habeas court was presented with conflicting factual testimony from three witnesses with direct knowledge of whether there was a plea agreement. The habeas court

set forth a detailed factual recitation of this conflicting testimony and highlighted the particular facts that guided its determination that there was not a plea agreement. This Court has stated:

> There are many critical aspects of an evidentiary hearing which cannot be reduced to writing and placed in a record, e.g., the demeanor of witnesses. These factors may affect the mind of a trier of fact in forming an opinion as to the weight of the evidence and the character and credibility of the witnesses. Thus, the importance of these factors should not be ignored by a reviewing court.

*Stephen L.H. v. Sherry L.H.*, 195 W. Va. 384, 395, 465 S.E.2d 841, 852 (1995), *superseded by statute on other grounds*.

> A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.

*Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

Ms. Bailes testified on three separate occasions about the existence of a plea agreement. During the trial, she unequivocally stated that she did not have an agreement with the State. In a deposition after the trial, she testified that Prosecutor Milam promised not to prosecute her if she testified for the State. At the omnibus hearing, Ms. Bailes testified that she had an agreement with the State that she would not be charged if she testified, but that Prosecutor Milam was not the one who made this deal with her and that she could not remember how the deal came about. Further, during the omnibus hearing, she stated that her memory about "these events" (i.e., the existence of a plea agreement) would have been better "at the trial." Based on the conflicting testimony that Ms. Bailes offered at these different proceedings, the habeas court determined that "it appears the most accurate assessment is that what she said at trial was fresh in her mind and was the most accurate statement of events, compared to any later statements she made to the contrary either in a deposition or in the omnibus hearing itself."

Next, the habeas court noted that Prosecutor Milam had never acknowledged the existence of the plea agreement. While Ms. Stanton offered testimony to the contrary, asserting that there was a plea agreement, the habeas court noted that it was undisputed that there was no written plea agreement and that even under Ms. Stanton's testimony, the alleged agreement lacked "definiteness and performance." Ms. Stanton testified that under the agreement, Ms. Bailes would either have her charges dismissed or she would plead to a misdemeanor with no jail time. Ms. Stanton conceded that the relief Ms. Bailes would

9

receive could change depending on the quality of her trial testimony. The habeas court determined that "[t]he ambiguity of Ms. Stanton's description of the supposed plea agreement lends itself to the conclusion that no agreement with clear, specific terms was in place."

In sum, the habeas court's determination that there was no *consummated*[5] plea agreement is supported by three main factors: 1) Ms. Bailes's trial testimony; 2) Prosecutor Milam's statement that the parties did not have a plea deal; and 3) Ms. Stanton's testimony that the terms of the alleged deal were not definite and were subject to change depending on the quality of Ms. Bailes's testimony.[6] We find that the habeas court was in the best position to assess the credibility of Ms. Bailes, Ms. Stanton, and Prosecutor Milam and that the court's detailed order clearly explaining its conclusion that there was not a *consummated* plea agreement is plausible in light of the record viewed in its entirety. Based on the foregoing, we find that the habeas court's ruling on this issue was not clearly erroneous. Having found that the habeas court did not err by concluding that there was not a plea agreement, Petitioner's assertions of prejudice arising from the secret plea agreement necessarily fail.[7]

---

[5] The habeas court correctly relied on this Court's ruling that substantial evidence is necessary to demonstrate that a *consummated* plea agreement has been reached: "While we do not require that a plea bargain agreement be written, although that is the far better course, we do require substantial evidence that the bargain was, in fact, a consummated agreement, and not merely a discussion." *State v. Wayne*, 162 W. Va. at 42-43, 245 S.E.2d at 840.

[6] We emphasize that though Ms. Stanton testified that there was a plea agreement, the alleged agreement she said was reached lacked a number of definite terms. First, it was unclear what relief Ms. Bailes would receive for her testimony. Ms. Stanton stated that Ms. Bailes would, depending on the veracity of her testimony, "either have her charges dismissed or she would plead to a misdemeanor with no jail time." Ms. Stanton did not set forth how "the veracity" of Ms. Bailes's trial testimony would be assessed and how the parties would ultimately determine what relief she would receive. Additionally, Ms. Stanton did not identify the party that would actually dismiss Ms. Bailes's charge after the trial. When asked if she knew that the charge would be dismissed by the circuit court judge, rather than by Prosecutor Milam, Ms. Stanton stated, "I suspected that."

[7] Clearly, there can be no *Brady* violation without a plea agreement. In the absence of an agreement, Prosecutor Milam could have indicted Ms. Bailes after the trial. However, he testified that after researching the issue, he determined that an employee could not be prosecuted as an accessory-after-the-fact for the criminal acts of her employer. Finally, without the existence of a plea agreement, Petitioner cannot sustain his argument that Ms. Bailes's trial testimony was false.

Petitioner's second assignment of error is that the habeas court erred by rejecting his argument that he was entitled to relief because one of the jurors was related to the State's witness, Ms. Bailes. According to Petitioner,

> it is clear that juror, Nelson Paul Bailes, is the uncle of April Bailes. Though the original witness call sheet, which was read to the jury during voir dire to ensure no connections between jurors and witnesses, stated April Bailes['s] name as "April O'Brien," when Ms. Bailes was called to testify, she was identified as "April Bailes."

> Nelson Bailes knew or should have known the familial connection between himself and Ms. Bailes. After hearing April Bailes identify herself as "April Bailes" during her testimony, he should have alerted the Court to the potential conflict.

The habeas court heard testimony on this issue during the omnibus hearing and rejected Petitioner's argument based on the following findings:

> April Bailes testified that she had never met Nelson Paul Bailes prior to the October 2018 hearing in this habeas proceeding. Nelson Paul Bailes testified that he had never met April Bailes prior to the October 2018 hearing in this proceeding. Based on the testimony of Nelson Paul Bailes, [and] April Bailes . . . it is clear that the witness, April Bailes, and the juror, Nelson Paul Bailes, had no knowledge of each other as of the time of the trial in the underlying criminal matter. . . . Based on the circumstances at the time of trial, it was reasonable for Nelson Paul Bailes not to notify the Court that he was related to the witness April Bailes, who was identified as April O'Brien. There is no indication that Nelson Paul Bailes intentionally misled the Court or parties regarding his qualifications to serve as a juror or his relationship to any of the witnesses. In fact, there is no reason to believe that any person intentionally deceived the Court or the parties about the familial relationship between Juror Nelson Paul Bailes and Witness April Bailes.

After review, we agree with the habeas court's ruling rejecting this argument. The undisputed testimony was that Nelson Bailes and Ms. Bailes had never met each other and did not know that they were related when the trial occurred. This Court has held that, "[w]hen a prospective juror is closely related by consanguinity to a prosecuting witness or

11

to a witness for the prosecution, who has taken an active part in the prosecution or is particularly interested in the result, he should be excluded upon the motion of the adverse party." Syl. Pt. 2, in part, *State v. Beckett*, 172 W. Va. 817, 310 S.E.2d 883 (1983). Clearly, the purpose of this rule is to prevent a juror from being biased in favor of a family member's testimony. We agree with the State's argument that because Nelson Bailes and Ms. Bailes had never met and did not know that they were related, "there can be no concern that Mr. Bailes was prejudiced against Petitioner or in favor of Ms. Bailes due to a familial relationship (and no concern that Ms. Bailes's testimony was somehow impacted due to the presence of Nelson Bailes on the petit jury)." Accordingly, we agree with the habeas court's ruling rejecting Petitioner's argument.[8]

The heading of Petitioner's final assignment of error is as follows: "The circuit court erred in finding that the Petitioner did not receive ineffective assistance of trial or appellate counsel." However, in the four paragraphs under this heading, Petitioner argues that he "is entitled to relief based upon the cumulative error doctrine." Because Petitioner's only substantive argument in this section addresses the cumulative error doctrine, we confine our analysis to that issue.

---

[8] Petitioner also asserts an ineffective assistance of counsel argument under this assignment of error. Petitioner contends that his trial counsel should have noticed that Nelson Bailes and April Bailes had the same last name. According to Petitioner, "[t]his should have led to a line of inquiry where the consanguineal connection between Juror Bailes and Witness Bailes could have been uncovered, and Mr. Bailes would have been removed from the jury." Because his trial counsel failed to engage in this inquiry during voir dire, Petitioner asserts that he received ineffective assistance of counsel. We disagree.

Pursuant to *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), we apply a two-pronged test when reviewing a claim of ineffective assistance of counsel: "(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.*, Syl. Pt. 5, in part. We find that Petitioner's claim fails under both prongs. Trial counsel's failure to question Nelson Bailes about his relationship with a witness identified on the call sheet as "April O'Brien" was not objectively unreasonable. Further, even if counsel had conducted this inquiry, it is clear that Ms. Bailes and Nelson Bailes had not met each other and did not know they were related at the time of Petitioner's trial. Thus, it is highly unlikely that this inquiry would have resulted in the discovery that the two were related. Finally, we have already concluded that no prejudice arose from Nelson Bailes being on the jury because he and Ms. Bailes did not know each other and did not know they were related. Therefore, there is no indication, much less a reasonable probability, that the result of the proceedings would have been different if counsel had asked Nelson Bailes whether he was related to Ms. Bailes during voir dire.

12

Our standard for reviewing a cumulative error argument was set forth in syllabus point five of *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972): "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." This Court has recognized that the cumulative error doctrine "should be used sparingly" and only where the errors are apparent from the record. *Tennant v. Marion Health Care Foundation, Inc.,* 194 W. Va. 97, 118, 459 S.E.2d 374, 395 (1995).

Petitioner's cumulative error argument is based on his assertion that he was prejudiced by 1) the State and Ms. Bailes entering into a secret plea deal, and 2) Nelson Bailes being on the jury. Because we have rejected these two errors, we find that Petitioner is not entitled to relief based on the combined effect of these alleged errors.

For the foregoing reasons, we affirm the habeas court's January 21, 2020, order.

Affirmed.

ISSUED: June 10, 2022

**CONCURRED IN BY:**

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn

**DISSENTING:**

Chief Justice John A. Hutchison
Justice William R. Wooton

13

Hutchison, C.J., dissenting:

Petitioner Gary Lee Rollins's conviction of the first-degree murder of his wife for which he was sentenced to life in prison, without mercy, was based, in large part, upon the bombshell testimony of his mistress, April Bailes. Following her arrest on the charge of being an accessory after the fact, Ms. Bailes testified at trial that, before Mrs. Rollins's body was discovered on the family farm, petitioner told Ms. Bailes that he had killed her and forced her to call 9-1-1 to report the accidental death. The credibility of Ms. Bailes's trial testimony hinged upon Prosecutor Milam's false statement to the jury that Ms. Bailes was not getting "some kind of consideration" for her testimony and promise that "[y]ou can bet your behind I'm going to indict [Ms. Bailes] next month" on the accessory charge. The problem here is that Prosecutor Milam's statement was not actually true. Rather, the substantial evidence of record showed that the State had made a deal with Ms. Bailes in exchange for her testimony that petitioner had confessed to killing his wife, a fact Prosecutor Milam intentionally withheld from petitioner in violation of petitioner's due process rights. Because I believe that Prosecutor Milam's misconduct in this regard warrants that petitioner be awarded a new trial, I respectfully dissent to the majority's decision to uphold the circuit court's order denying petitioner's request for habeas relief.

This Court has long held that "[t]he prosecution must disclose any and all inducements given to its witnesses in exchange for their testimony at the defendant's trial." Syl. Pt. 2, *State v. James*, 186 W. Va. 173, 411 S.E.2d 692 (1991). This is because "[s]uch deals are crucial as impeachment evidence; in some cases the jury may decide that the deal has created an incentive for the witness to lie." *Id.* at 175, 411 S.E.2d at 694. Indeed, "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Syl. Pt. 4, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982); *accord Brady v. Maryland*, 373 U.S. 83 (1963). "[E]vidence reflecting on the credibility of a key prosecution witness may be so material to the issue of guilt as to qualify as exculpatory matter which the prosecution is constitutionally required to disclose[.]" *State v. Fortner*, 182 W. Va. 345, 354, 387 S.E.2d 812, 821 (1989). Finally, "[c]lear evidence of a deal directly linking leniency for [a witness] with testimony tending to convict [the defendant] that was not disclosed would be grounds for a new trial." *James*, 186 W. Va. at 175, 411 S.E.2d at 694.

At the omnibus hearing in this case, petitioner presented credible evidence that the prosecuting attorney induced Ms. Bailes into giving inculpatory testimony at petitioner's trial in exchange for either dismissing the accessory charge against her or allowing her to plead to a misdemeanor with no jail time. In addition to Ms. Bailes's testimony that she agreed to testify against petitioner based upon the understanding that she would not be prosecuted as an accessory, Ms. Bailes's attorney, Cynthia Stanton, also testified. Ms. Stanton related that it was a routine practice in Prosecutor Milam's jurisdiction to note "pending further investigation" on preliminary hearing waiver forms to signify that an oral

14

plea deal had been reached so as to compel a defendant to cooperate with law enforcement or a prosecuting attorney in exchange for the dismissal of pending charges. Ms. Stanton testified that, consistent with this practice, she struck an oral agreement with Prosecutor Milam in October of 2011 at Ms. Bailes's preliminary hearing in magistrate court, which was reflected on Ms. Bailes's preliminary hearing waiver form by the notations of "further investigation" and "Don't reset this again until after September 1st. Grand jury is 9/11, after that also? [Response:] Yes."[1] According to Ms. Stanton's testimony, this meant "that there was a plea agreement and not to reset [Ms. Bailes's preliminary hearing] . . . to see if she performed on her part of the plea agreement." Ms. Stanton was so certain that a plea deal had been reached that, when she learned that Prosecutor Milam had falsely advised the jury at petitioner's trial to the contrary, she promptly addressed the issue with a circuit court judge because she believed Prosecutor Milam had committed an ethics violation. Ms. Stanton testified that, in Prosecutor Milam's presence, she told the judge, "[U]nder no circumstances would I put anyone to trial on a murder case without a plea agreement." Even the assistant prosecuting attorney at the time, Jonathon Sweeney, agreed that the routinely used shorthand notation on hearing waivers Ms. Stanton described, including on Ms. Bailes's form, meant that the charges would be held in abeyance in order to "keep the pressure on the witness to testify." Although Prosecutor Milam admitted to commonly striking deals with defendants in the manner described by both Mr. Sweeney and Ms. Stanton, he testified that, despite the documentary evidence to the contrary, he did not strike such a deal with Ms. Bailes. Moreover, incredulously, he somehow could not recall being summoned to the circuit judge's chambers after Ms. Stanton essentially accused him of lying to the jury at petitioner's trial. Prosecutor Milam's testimony is not compelling because it is not credible.[2]

---

[1] The grand jury was scheduled to meet after petitioner's trial occurred in August of 2012.

[2] Prosecutor Milam's untruthfulness with respect to Ms. Bailes was seemingly without limits. The majority recounts that "Prosecutor Milam testified that he intended to indict Ms. Bailes following Petitioner's trial.  However, after researching the potential criminal charge against Ms. Bailes, he determined that an employee could not be prosecuted as an accessory-after-the-fact for the criminal acts of her employer." The majority overlooks that it was *prior to trial* that Milam advised the circuit court,

> I don't believe she committed a crime because I don't believe
> she willfully [called 9-1-1]. I think she was under duress . . . .
> [I]f she testifies to what she told us previously, then I do not
> believe she's committed a crime, and I'll put that in writing . .
> . as being the State's position[.]

Despite making this attestation in open court (but apparently without ever advising Ms. Bailes), Prosecutor Milam proceeded to tell the jury during petitioner's trial, "You can

We have instructed that "'where there is doubt over the existence of an agreement between the State and a defendant, but substantial evidence, although circumstantial, is present which suggests that an agreement existed, this Court will resolve the benefit of the doubt in the defendant's favor.'" *State ex rel. Yeager v. Trent*, 203 W. Va. 716, 722, 510 S.E.2d 790, 796 (1998). There was clearly substantial evidence presented at petitioner's omnibus hearing demonstrating that an agreement had been reached between Ms. Bailes and the State whereby Ms. Bailes would (*and did*) testify that petitioner confessed to the murder of his wife in exchange for the dismissal or leniency of the charge against Ms. Bailes. Not only did Ms. Bailes and Ms. Stanton testify that a deal had been made, petitioner also established that Prosecutor Milam went to some lengths to evade his constitutional obligation to disclose the agreement. Indeed, in Ms. Bailes's case and others, Prosecutor Milam went so far as to create and implement an internal code that served to conceal plea deals and remind him to honor such deals after the opportunity to test the credibility of the witness has passed.[3] By failing to resolve any benefit of the doubt as to the existence of a plea agreement in Ms. Bailes's favor, the majority has unwittingly condoned this pattern of outright chicanery.

This Court has held that for there to be a constitutional due process violation under *Brady* and *Hatfield*, "(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial." Syl. Pt. 2, in part, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). Because the evidence shows that Prosecutor Milam struck a plea deal with Ms. Bailes in exchange for her critical incriminating testimony against petitioner, that evidence of the deal was intentionally withheld from petitioner, that it was favorable to petitioner as exculpatory, and that it was highly prejudicial to petitioner at trial, petitioner's constitutional due process rights were violated and a writ of habeas corpus should have been granted.

For the foregoing reasons, I respectfully dissent.

---

bet your behind that I'm going to indict [Ms. Bailes] next month[,]" thereby bolstering her credibility. The majority has failed to recognize that Prosecutor Milam played fast and loose with the truth as it related to Ms. Bailes and it clearly erred in giving any credence whatsoever to Milam's testimony as it related to the existence of a plea agreement with his star witness.

[3] There was some testimony suggesting that, in cases involving defendants who were confidential informants, plea agreements were not put into writing in order to protect the informants' safety.

16

Wooton, Justice, dissenting:

In a memorandum decision, the majority affirms the circuit court's order denying relief in habeas corpus to petitioner, Gary Lee Rollins.[1] In so doing, the majority causally dispenses with petitioner's claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the existence of a secret plea agreement entered into between the State and its key witness, April Bailes, wherein in exchange for Ms. Bailes' trial testimony that petitioner confessed to her that he killed his wife, the State would either dismiss the charge of accessory after the fact or allow her to plead to a misdemeanor with no jail time. The majority rests its decision on the circuit court's factual findings, determining that none of those findings could be deemed clearly wrong.[2] In my view, the majority's examination of petitioner's alleged error in this case is woefully deficient, both legally and factually.[3] In *Napue v. Illinois*, 360 U.S. 264, 272 (1959), the United States Supreme Court considered a case is similar to the case at bar in that the defendant's conviction was based in part on the testimony of a witness who falsely testified that the State had not promised him any consideration in exchange for his testimony. The Supreme Court rejected the State's argument that it was not free to reach a factual conclusion

---

[1] Petitioner was convicted of first-degree murder and sentenced to life without mercy. His conviction was affirmed on direct appeal. *See State v. Rollins*, 233 W. Va. 715, 760 S.E.2d 529 (2014).

[2] The entirety of the majority's decision in regard to this issue hinges on "the habeas court's factual findings." The majority correctly sets forth the "clearly wrong" standard of review which is applicable to factual determinations made by a circuit court in post-conviction habeas corpus proceedings. *See* Syl. Pt. 1, *State ex rel. Postelwaite v. Bechtold,* 158 W. Va. 479, 212 S.E.2d 69 (1975). However, the reasoned application of this standard of review to the evidence of plea negotiations with the State's key witness, which will be discussed *infra* in greater detail, leads even the casual reader to the inevitable conclusion that the circuit court's findings were clearly wrong. Further, as the Court stated in *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007), "'[a] claim of a violation of *Brady* and *Hatfield* presents mixed questions of law and fact. Consequently, the "circuit court's factual findings should be reviewed under a clearly erroneous standard and . . . questions of law are subject to *de novo* review." *State v. Kearns*, 210 W.Va. 167, 168-169, 556 S.E.2d 812, 813-814 (2001).'" *Youngblood*, 221 W. Va. at 26, 650 S.E.2d at 125. Here, the majority omits any review, let alone de novo review, of the law in resolving the alleged *Brady* violation. *Id*.

[3] I concur with the majority's resolution of petitioner's remaining two assignments of error: that the habeas court erred in finding that he was not "materially prejudiced" because one of the jurors was related to a witness for the State, and that he is "entitled to relief based upon the cumulative error doctrine."

different from that reached by the lower court, stating that "[i]t is now so well settled that the Court was able to speak . . . of the 'long course of judicial construction which establishes as a principle that the duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest.'" *Id*. at 272 (citation and footnote omitted). Because the majority has avoided its clear duty to afford petitioner a thorough examination of his claim, which if conducted would have led to the relief he sought, I respectfully dissent.

First, the majority's decision is devoid of any discussion of the law associated with the constitutional issue before it. With only a passing citation to *Brady* – there is no discussion or analysis of that case or this Court's subsequent decisions based thereon – the majority pronounces in a footnote that "there can be no *Brady* violation without a plea agreement[,]" and then finds that the circuit court's decision that "there was not a *consummated* plea agreement *is plausible in light of the record viewed in its entirety*." (Some emphasis added). The majority deems this factual finding "not clearly erroneous" and summarily concludes its discussion of petitioner's alleged *Brady* violation.

Succinctly stated, the majority's focus on a "*consummated* plea agreement," defined as one not "lack[ing] a number of definite terms," demonstrates a fundamental lack of understanding of the essence of a *Brady* violation. In *Brady*, the Supreme Court held that "the suppression by the prosecution *of evidence* favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87 (emphasis added).

Following *Brady*, in *Giglio v. U. S.*, 405 U.S. 150 (1972), the Supreme Court tackled the issue of whether the government's failure to disclose an alleged promise of leniency made to its key witness in return for his testimony violated petitioner's constitutional due process rights. *Id*. at 152. The Supreme Court characterized such a failure on the government's part as follows:

> As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id*., at 269, 79 S.Ct., at 1177. Thereafter *Brady v. Maryland*, 373 U.S., at 87, 83 S.Ct., at 1197, held that suppression of material evidence justifies a new

18

trial 'irrespective of the good faith or bad faith of the prosecution.' See American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function s 3.11(a). *When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. Napue*, *supra*, at 269, 79 S.Ct., at 1177.

*Giglio*, 405 U.S. at 153-54 (emphasis added). The Supreme Court concluded that because the government's case "depended almost entirely" on the testimony of the witness, the credibility of the witness "was therefore an important issue in the case, and evidence of *any understanding or agreement* as to a future prosecution would be relevant to his credibility and the jury was entitled to know it." *Id*. at 154-55 (emphasis added). Thus, the Supreme Court determined that due process required a new trial, reversing petitioner's conviction. *Id*. at 155.

Similarly, this Court has well-established precedent protecting a defendant's constitutional due process rights under *Brady*. The Court held in syllabus points four and five of *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982) that

> [a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.

> "When a trial court grants a pre-trial discovery motion requiring the prosecution to disclose evidence in its possession, *non-disclosure by the prosecution is fatal to its case where such non-disclosure is prejudicial. The non-disclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case*." Syllabus Point 2, *State v. Grimm*, [165] W.Va. [547], 270 S.E.2d 173 (1980).

(Emphasis added).

Subsequently, in syllabus point two of *State v. James*, 186 W.Va. 173, 411 S.E.2d 692 (1991), the Court held that "[t]he prosecution *must disclose any and all inducements* given to its witnesses in exchange for their testimony at the defendant's trial." In so holding, we found that

19

> [s]uch deals are crucial as impeachment evidence; in some cases the jury may decide that the deal has created an incentive for the witness to lie. [Petitioner] claims that the State made such a deal with [a witness] and did not disclose it to him. . . .
>
> . . . Clear evidence of a deal directly linking leniency for [the witness] with testimony tending to convict [petitioner] that was not disclosed would be grounds for a new trial."

*Id*. at 175, 411 S.E.2d at 694.

In *State ex rel. Yeager v. Trent*, 203 W. Va. 716, 510 S.E.2d 790 (1998),[4] this Court again considered the issue of a prosecutor's decision to withhold evidence of plea negotiations between the State and its key witness. In *Yeager*, a case with facts remarkably similar case to those in the instant matter, prior to the testimony of a key witness for the State, an in camera hearing was held in which the lower court asked the State whether there were any plea bargains or agreements with the witness. The State denied the existence of any such agreements and the witness did the same when questioned about this in front of the jury. *Id*. at 720, 510 S.E.2d at 794. During the ensuing habeas proceeding, the former Logan County prosecutor was deposed and testified that, to his recollection, there was such an agreement between the State and the witness whereby the witness would plead guilty to misdemeanor charges in exchange for his favorable testimony. The prosecutor further stated that such agreements "would not have been anything reduced to writing when the plea agreement was reached." *Id*. The witness' attorney testified that the witness was "the only client he allowed to testify without the benefit of a plea agreement of some kind." *Id*. The attorney denied the existence of a plea agreement but acknowledged that "it was his understanding that if his client's testimony bore out at the Appellant's trial, 'they would drop his [the witness'] case at some point.'" *Id*. The witness testified that he was unaware of any plea agreement to the effect that the charges against him would be dropped if he testified against the Appellant. *Id*. Subsequently, the prosecutor informed the circuit court that his testimony in his first deposition was incorrect; in a second deposition, he stated that there was no plea agreement between the State and the witness. *Id*. at 721, 510 S.E.2d at 795.

On appeal, the appellant argued that the circuit court erred in refusing to set aside his conviction and grant him a new trial based on the State's failure "to disclose an agreement with a critical witness regarding criminal charges pending against that witness."

---

[4] The memorandum decision is devoid of any mention of *Yeager* notwithstanding that its facts so closely parallel the facts of the instant case.

*Id*. The Court, relying on *James*, recognized that it could not "unequivocally state that the plea agreement existed." The Court further found it

> troubling that the question of whether or not a plea agreement existed is so unresolved that even the prosecuting attorney is on the record as adopting two opposite positions with respect to whether there was a plea agreement. This is, at a minimum, sloppy practice. This entire scenario illustrates why, although there is no rule requiring that plea agreements be in writing, it clearly is the better practice.

*Id*. However, despite the lack of a written plea agreement with definite terms – and the lack of testimony establishing the existence of an actual plea agreement – the Court stated:

> In cases such as this, where there is doubt over the existence of an agreement between the State and a defendant, but substantial evidence, although circumstantial, is present which suggests that an agreement existed, this Court *will resolve the benefit of the doubt in the defendant's favor. See State v. Wayne*, 162 W.Va. 41, 42-43, 245 S.E.2d 838, 840 (1978), *overruled on other grounds, State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)("[W]e do require substantial evidence that the bargain was, in fact, a consummated agreement, and not merely a discussion.")[.]

*Yeager*, 203 W. Va. at 722, 510 S.E.2d at 796 (emphasis added). Based on its review of all the evidence considered by the circuit court, this Court reversed and remanded for a new trial, concluding that the lower court's findings as to the State's nondisclosure of a plea agreement with the witness were clearly wrong. *Id*. at 723, 510 S.E.2d at 797. In this regard, the Court concluded that "the failure to disclose the plea agreement between the State and [the witness] was material to the impeachment of a critical witness, because the witness presented testimony that was critical to the Appellant's conviction[.]" *Id*. at 723, 510 S.E.2d at 797. The Court further stated that

> had the Appellant been informed about the plea agreement, he could have subjected [the witness] to extensive cross-examination that could have impacted upon the witness' credibility. Without having the opportunity to ask these questions in front of the jury, we conclude that the Appellant was deprived of a significant opportunity to challenge [the witness'] credibility.

*Id*.

21

Thereafter, this Court held in syllabus point two of *Youngblood*:

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) *the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence*; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., *it must have prejudiced the defense at trial*.

221 W. Va. at 22, 650 S.E.2d at 121, Syl. Pt. 2 (emphasis added). The Court further expounded upon the "materiality" factor in *Buffey v. Ballard*, 236 W. Va. 509, 782 S.E.2d 204 (2015), as follows:

> Evidence is deemed material "if there is a reasonab[le] probability that, had the evidence been disclosed to the defense the result of the proceeding would have been different." *State v. Morris*, 227 W.Va. 76, 85, 705 S.E.2d 583, 592 (2010) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, "a showing of materiality does not require demonstration by a preponderance [of the evidence] that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . ." K*yles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

*Buffey*, 236 W. Va. at 516-17, 782 S.E.2d at 211-12.

In its summary rejection of petitioner's *Brady* claim, the majority fails to address not only *Brady* itself but also our well-established law explicating that decision. Had the majority undertaken a *Brady/Hatfield* analysis, it would be apparent that all elements of the *Brady/Hatfield* test were met; as discussed *infra* in greater detail, the evidence at issue – the secret deal between the State and Ms. Bailes – would have been favorable to petitioner as exculpatory or impeachment evidence; the existence of the deal made between the State and Ms. Bailes was suppressed by the State, either willfully or inadvertently; and, the existence of this deal was material, i.e., it prejudiced the defense at trial. *See Youngblood*, 221 W. Va. at 22, 650 S.E.2d at 121, Syl. Pt. 2.

Second, the majority's resolution of this case on the facts – specifically the majority's conclusion that the circuit court's finding that there was no "consummated plea agreement" was "plausible" based upon a review of the appendix record "in its entirety" –

22

is fatally flawed.  Additionally, as previously mentioned the majority's pronouncement that "[c]learly, there can be no *Brady* violation without a plea agreement[]" is untenable in light of the law set forth *supra*.  Critically, the majority's review of the evidence in this case omits both critical witness testimony and factual findings made by the circuit court that undermine the majority's decision.

As background, Ms. Bailes was the State's key witness. She was petitioner's employee with whom petitioner was having an affair.  Prior to October, 2011, Ms. Bailes gave statements to law enforcement which in no way implicated petitioner in the murder of his wife;[5] however, after arrest on a charge of accessory after the fact,[5] she changed her story and claimed that petitioner had confessed to committing the crime. At petitioner's pre-trial hearing, the then-prosecuting attorney, James K. Milam II, informed the circuit court that he was not likely to prosecute Ms. Bailes because it did not appear she had committed a crime. Nonetheless, the felony charge had not been dismissed at the time petitioner's case came to trial.

Despite the existence of the pending charge, Ms. Bailes testified at petitioner's trial that he confessed to her that he had murdered his wife. This testimony was critical to petitioner's conviction, because without it the State's case was based wholly on circumstantial evidence; there were no eyewitnesses who could place petitioner in the vicinity of his wife at or near the time of her death.  Ms. Bailes also testified that she had not received anything from the State in exchange for her testimony.[6]

Two significant events occurred after Ms. Bailes' trial testimony.  First, the circuit court instructed the jury that Ms. Bailes was facing a charge of accessory after the fact, which carried a penalty of five years in prison.  Second, during closing arguments petitioner's counsel argued to the jury that Ms. Bailes only testified against petitioner because the State promised not to prosecute her.  Specifically, Petitioner's counsel argued:

> And she knew what they wanted her to say because they'd been
> trying to get her to say it for two years, and they couldn't do it

---

[5] The charge against Ms. Bailes was based on the theory that she knew that petitioner had killed his wife because she had called 9-1-1 to report the wife's death.

[6] In regard to the alleged plea agreement, there is no question that petitioner's counsel inquired by letter of both Ms. Bailes' counsel, Cynthia Stanton, and the then-prosecuting attorney ("the prosecutor"), James K. Milam II, if there was any information in regard to any plea agreement between Ms. Bailes and the State.  Ms. Stanton never answered the letter and the prosecutor denied the existence of any plea agreement.

> until they put the cuffs on her. She knew what they wanted. In the end, she gave it to them for her freedom.[7]

(Footnote added). In turn, in the State's closing rebuttal argument, the prosecutor told the jury,

> You can bet your behind I'm going to indict [Ms. Bailes] next month.
>
> If she'd told us this from the beginning, two years ago, three years ago now, this case would have been totally different, but she held that information in -- in her pocket for two years, and she didn't [tell] anyone until she was in trouble, and she tried to save her own behind. Well, it's too late at that point. She's being prosecuted as accessory after the fact in this case.[8]

(Footnote added). Following the trial, and contrary to the unequivocal representation to the jury that Ms. Bailes would be indicted – a representation that undoubtedly bolstered Ms. Bailes' testimony and was the last thing the jury heard before its deliberations began – the prosecutor never indicted Ms. Bailes for any crime.

At the omnibus hearing, the prosecutor testified that if he had entered an agreement with a potential criminal defendant, the agreement would have been reduced to writing or addressed in magistrate court prior to the felony preliminary hearing. He testified that he did not enter into a plea agreement with Ms. Bailes in exchange for her testimony at trial. He stated that he had always intended to prosecute her for her dishonesty with police until he performed legal research and determined that an employee could not be prosecuted as an accessory-after-the-fact for the criminal acts of her employer. He also testified that his decision not to prosecute Ms. Bailes was influenced by his assessment that Ms. Bailes was under significant duress because of petitioner's threat. Petitioner's counsel confronted the prosecutor regarding the prosecutor's representation (made at petitioner's pretrial hearing) that the State did not intend to prosecute Ms. Bailes because she had not committed a crime,

---

[7] At the omnibus hearing, petitioner's trial counsel testified that he became "suspicious" that the State had struck a deal with Ms. Bailes in which she would receive favorable treatment in exchange for her testimony against petitioner after Ms. Bailes was arrested and provided law enforcement with an additional statement in regard to allegations against petitioner. Petitioner's trial counsel asked the prosecutor if a plea agreement had been entered with Ms. Bailes. The prosecutor told him that there was no deal and maintained that position throughout trial.

[8] *See supra* note 1.

asking, "So, when you previously testified here a while ago -- that you intended on prosecuting her all the way through the trial, that was not truthful, was it, sir?" The prosecutor responded, "Yeah, it is."

The current Nicholas County Prosecutor, Jonathon Sweeney, also testified. Notably, the majority fails to mention Mr. Sweeney's testimony in its memorandum decision. Mr. Sweeney testified that he was the assistant prosecutor for Nicholas County in 2012, when the alleged plea agreement was entered into between the prosecutor, Mr. Milam, and Ms. Bailes. Importantly, Mr. Sweeney testified that he reviewed documents filed in magistrate court concerning Ms. Bailes' charges seeking leave to delay the preliminary hearing "pending further investigation"; he stated that this is how the Nicholas County Prosecuting Attorney's Office has traditionally dealt with oral plea agreements related to witness testimony. Mr. Sweeney also testified that information on a sticky note found in the prosecutor's file indicated that the prosecutor was "going to hold this in abeyance until after grand jury so they could keep the pressure on the witness to testify."

Cynthia Stanton, the public defender who represented Ms. Bailes at the time of petitioner's trial also testified at the omnibus hearing. Ms. Stanton stated that Ms. Bailes entered into an oral agreement with the State whereby the charges against her would be dismissed or she would be allowed to plead to a misdemeanor, with no jail time, provided that she offered truthful testimony against petitioner at his trial. Corroborating Mr. Sweeney's testimony, Ms. Stanton testified that it was common practice to enter into oral plea agreements with the State, which agreements were memorialized as described by Mr. Sweeney. Specifically, she testified that it was common practice in Nicholas County Magistrate Court to write the words "further investigation" on the on the back of a Magistrate Court Waiver of Timeframe for Preliminary Hearing form when there had been a plea agreement reached whereby a defendant would cooperate with law enforcement or the prosecutor in exchange for the prosecutor's agreement to drop the criminal charges against the defendant. Ms. Stanton stated that Ms. Bailes' preliminary hearing was waived multiple times until petitioner's trial concluded.

Ms. Stanton testified that she was informed by her associate, who observed petitioner's trial, of the prosecutor's promise to the jury during closing arguments that he was going to indict Ms. Bailes. Ms. Stanton testified that because she knew the prosecutor's statements were not true, she did some research on what her ethical duties were and determined that she could either file an ethics complaint against the prosecutor or go to the circuit judge and tell him what had transpired. In late August, 2012, Ms. Stanton met with the circuit judge and the prosecutor and informed both that she had an ethical duty to report the prosecutor for an ethics violation based on his representation to the jury at trial that he intended to prosecute Ms. Bailes, a representation which was not true because the prosecutor had made an oral plea agreement with her client. Ms. Stanton

25

also told the circuit court judge that "he knew, under no circumstances," would she allow someone to testify in any case without a plea. She stated that the circuit court judge and prosecutor indicated to her that the grand jury had not met yet "so it was not an issue[.]" She testified that the prosecutor never presented the charge against Ms. Bailes to the grand jury and the circuit court dismissed the charges against her client.

At the omnibus hearing, Ms. Bailes contradicted her trial testimony by testifying that it was her understanding that her attorney, Ms. Stanton, had reached an agreement with the prosecutor under which she would not be indicted if she testified.

Based upon the foregoing testimony, the circuit court made factual findings that were equivocal at best. The circuit court found that "on the issue of whether a deal existed, the evidence is mixed." Further, despite finding that Ms. Stanton's testimony "failed to establish that there was a consummated agreement rather than a general discussion[,]" the circuit court then found that "[t]he agreement lacked certainty" which, at a minimum, implies that an agreement existed. The circuit court then found that "the prosecuting attorney has never acknowledged any agreement, and the agreement alleged to have existed by counsel for the defendant was not one with definiteness and performance." Succinctly stated, the circuit court's findings in regard to the plea agreement lacked even a modicum of clarity.

Contrary to the circuit court's ruling, which the majority affirms in the absence of any legal analysis, in a case alleging a *Brady* violation our law only requires evidence that *suggests* the existence of a plea agreement and requires that this Court resolve any doubt thereof in favor of the defendant. *Yeager*, 203 W. Va. at 722, 510 S.E.2d at 796 ("where there is doubt over the existence of an agreement between the State and a defendant, but *substantial evidence, although circumstantial, is present which suggests that an agreement existed*, this Court will resolve the benefit of the doubt in the defendant's favor." (emphasis added)). Rather, than follow the clear mandate of *Yeager,* the majority seized on dicta in an earlier case. *See State v. Wayne*, 162 W. Va. 41, 245 S.E.2d 838 (1978), ), *overruled on other grounds, State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)("[W]e do require substantial evidence that the bargain was, in fact, a consummated agreement, and not merely a discussion."). The majority's sub silentio elevation of this dicta to the status of controlling law contravenes our holding in syllabus point two of *James*, which requires the State to "disclose *any and all inducements* given to its witnesses in exchange for their testimony at the defendant's trial." 186 W. Va. at 174, 411 S.E.2d at 693, Syl. Pt. 2, in part (emphasis added). This specific requirement, that the State disclose "any and all inducements," is far broader than the majority's view that only a "consummated agreement" need be disclosed. *See id*. In short, the majority's determination that the State is only required under the *Brady*/*Hatfield* line of cases to disclose a consummated plea agreement is fundamentally incorrect, and its determination that the findings made by the

26

circuit court on this issue were not "clearly wrong," contravenes our clearly established case law.

It is beyond cavil that the facts presented at the omnibus hearing in this case "suggest[] that a plea agreement exited." *See id.* The evidence from multiple witnesses, including the current prosecutor, Mr. Sweeney, supports finding that there was a deal between Ms. Bailes and the State that was entered into before the petitioner's trial. This evidence included the testimony of Ms. Bailes' counsel that a deal existed, as well as Mr. Sweeney's testimony that the manner in which Ms. Bailes' case was handled at the preliminary hearing stage showed that a plea agreement had been entered into between the State and the witness. Further, the evidence before the circuit court was that the prosecutor's statements and actions were a moving target, from his statement to the court at the pretrial hearing that he did not believe Ms. Bailes had committed a crime, to his statement to the jury that they could "bet [their] sweet behind" he was going to indict her as accessory after the fact for murder, to his failure to indict her following trial. This inconsistency further supports a finding that a plea agreement did in fact exist – a plea agreement that was never disclosed to petitioner. If all this evidence had been resolved in petitioner's favor, as the law requires, the clear takeaway would be that there was indeed a plea agreement that was never disclosed by the State. *See Youngblood*, 221 W. Va. at 22, 650 S.E.2d at 121, Syl. Pt. 2.

Moreover, let there be no mistake: this evidence of a plea agreement was prejudicial to petitioner. Ms. Bailes was the State's key witness and petitioner should have been afforded the opportunity to impeach her with evidence of the plea agreement. Instead, Ms. Bailes, who was testifying in order to avoid prosecution, was allowed to hold herself out to the jury as a person sacrificing her own freedom for the State's benefit with no promises of leniency. *See id.*

Further, the majority's opinion gives the prosecutor a pass for making false and extremely prejudicial statements to the jury promising that he was going to indict Ms. Bailes for felony accessory after the fact to murder when he knew he couldn't – and indeed didn't – because of the plea agreement he had with the witness. Every aspect of the prosecutor's conduct in this case involving the plea agreement with Ms. Bailes was materially prejudicial to petitioner and denied him his right to a fair trial. *See id.*

The majority's decision in this case serves to diminish and dilute a defendant's constitutional due process right to a fair trial, by removing any incentive for the State to play by the rules established in *Brady* and its progeny. Our law requires disclosure of both substantive and impeachment evidence materially favorable to the defendant, and this Court has a duty to see that this law is scrupulously observed. At the end of the day, whether or not this petitioner was guilty or innocent of the crime for which he is now serving a life sentence without possibility of parole, the inescapable fact is that he had a

constitutional right to a fair trial and did not receive one. For this reason, I respectfully dissent.